## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PENSON WORLDWIDE, *et al.*, | ) | Case No. 13-10061 (LSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| PENSON TECHNOLOGIES LLC, | ) | |
| (successor in interest to SAI | ) | |
| HOLDINGS, INC. and PENSON | ) | |
| FINANCIAL SERVICES, INC.), | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 16-51522 (LSS) |
| | ) | |
| v. | ) | Docket Ref. Nos. 49, 50, 51, 55, 58 |
| | ) | |
| SCHONFELD GROUP HOLDINGS | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## OPINION

Plaintiff Penson Technologies LLC, as "successor in interest" to SAI Holdings, Inc.

("SAI") and Penson Financial Services, Inc. ("PFSI"), initiated this post-confirmation

adversary proceeding seeking to recover damages for alleged breaches of contract against

Defendant Schonfeld Group Holdings LLC. Plaintiff also objected to Defendant's proof of

claim. Before the Court is Defendant's motion for summary judgment (the "Motion"[1]) on

---

[1] D.I. 49. The Motion is accompanied by the Memorandum of Law in Support of Defendant
Schonfeld Group Holdings LLC's Motion for Summary Judgment, D.I. 50 ("Opening Brief"), as
well as the Declaration of Andrew Fishman in Support of Defendant Schonfeld Group Holdings
LLC's Motion for Summary Judgment, D.I. 51 ("Fishman Decl."). Mr. Fishman is Defendant's
President, and he states that he has personal knowledge of the facts set forth in his declaration and
attests to the authenticity of the 27 documents attached to his declaration. Fishman Decl. ¶ 1.

each count set forth in the Complaint.    For the reasons set forth below, the Motion is granted.

*Background*

A.    **The Acquisition**

In November 2006, Defendant's wholly-owned subsidiary Schonfeld Securities, LLC ("SSLLC" or "Seller"), sold its clearing and joint back office operations (defined as the "Business") to SAI Holdings, Inc. as memorialized in that certain Asset Purchase Agreement ("APA") dated as of November 20, 2006.[2]  Defendant signed the APA both as Manager of SSLLC and in its own capacity for purposes of certain sections of the APA (including section 6.02, below).  The parties agree that SSLLC later assigned its rights and obligations under the APA to Defendant.[3]

The assets sold included all of Seller's assets, powers and rights of any type used in the Business.  Those assets included certain clearing agreements with Seller's affiliated proprietary trading firms, known as introducing brokers or correspondents.  More specifically, and as explained in the APA, the sale of that asset really meant that Seller permitted its affiliates who were introducing brokers to enter into newly signed clearing arrangements with Buyer's wholly owned subsidiary, PFSI.

Pursuant to the APA, PFSI and Opus Trading Fund, LLC ("Opus"), an introducing broker, executed a clearing agreement by which PFSI would provide clearing and financing services to Opus for a period of ten years ("Clearing Agreement").[4]  This agreement was subsequently replaced by another clearing agreement between the parties, namely that

---

[2]  Fishman Decl. Ex. B (APA).
[3]  Opening Brief 10 n.4; Compl. ¶ 8.
[4]  Fishman Decl. Ex. C (Clearing Agreement).

certain Portfolio Margining Account Side Agreement ("PMA Side Agreement"), which was

also effective for approximately ten years.[5]  Both clearing agreements provide that PFSI

would be Opus' exclusive clearing broker during the ten-year term of the contract.[6]

The APA further contemplates that Defendant would provide certain guarantees.

Specifically, section 6.02 of the APA provides in relevant part:

> Covenants and Guaranties of the Manager.    Schonfeld Group Holdings LLC
> [Defendant], the manager of the Company [Seller] and a Company Member (the
> "Manager"), hereby agrees to absolutely, unconditionally and irrevocably
> guarantee the immediate payment of, and the full, complete and timely
> performance of, each of the Company's obligations contemplated by this
> Agreement and the Ancillary Agreements pursuant to the terms of a Guaranty
> Agreement ("Guaranty Agreement") to be executed and delivered to Buyer
> simultaneously herewith.[7]

Consistent with section 6.02, contemporaneously with execution of the APA, Defendant

executed that certain Unconditional Guaranty Agreement (the "Guaranty Agreement").[8]

Under the Guaranty Agreement, Defendant "absolutely, unconditionally and irrevocably

guarantees to the Companies [PFSI and SAI] the full and timely payment and/or

---

[5] Fishman Decl. Ex. E (PMA Side Agreement).  For purposes of the Motion only, Defendant
concedes that the PMA Side Agreement, not the Clearing Agreement, is the relevant document for
purposes of the unconditional guarantee. *See* Pl.'s Mem. in Opp'n 12 n.6, D.I. 55 ("Answering
Brief").

[6] Fishman Decl. Exs. C (Clearing Agreement) § 11(b) (A82), E (PMA Side Agreement) § 5 (A142).

[7] Fishman Decl. Ex. B (APA) § 6.02 (A45).  That section continues:
> The Manager further agrees to (i) cause the Company to comply with the provisions of
> this Agreement, and (ii) refrain from taking any action that is reasonably likely to impair
> the Company's ability to perform its obligations under this Agreement or any of the
> Ancillary Agreements.  The Manager has received the approval of 100% of its equity
> holders having the right to vote as to the execution, delivery and performance of this
> Agreement and each applicable Ancillary Agreement executed by the Manager.  This
> Agreement and each applicable Ancillary Agreement executed by the Manager have been
> duly executed and delivered by the Manager and constitute the valid and binding
> obligation of the Manager, enforceable against the Manager in accordance with their
> terms.
Fishman Decl. Ex. B (APA) § 6.02 (A45).

[8] Fishman Decl. Ex. A (Guaranty Agreement).

performance, as the case may be, of all of the Guaranteed Obligations."[9] "Guaranteed

Obligations" is defined as:

    (i)    **to PFSI** the full and complete performance **by the Introducing Brokers** (as set forth in sections 1(e), **11(b)**, 17 and 20(d) of the Clearing Agreements), and

    (ii)   **to SAI**, the full and complete payment and performance **of the obligations of Seller** under the APA.[10]

As relevant here, section 11(b) of the Clearing Agreement—now section 5 of the PMA Side

Agreement—contains Opus' contract exclusivity obligation ("Contract Exclusivity

Provision").[11]

---

[9] *Id.* at A2.

[10] The full recital reads:

> For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and as a material inducement to PFSI to enter into the Services Agreement, the Execution Agreement and each of the Clearing Agreements and to SAI to enter into and to close the transactions contemplated by the Asset Purchase Agreement, Guarantor hereby absolutely, unconditionally and irrevocably guarantees (i) to PFSI, the full and complete payment and performance of the obligations of each of Tools and Schon-EX under the Services Agreement and the Execution Agreement, and the full and complete performance by the Introducing Brokers of the obligations of the Introducing Brokers set forth in Sections 1(e), 11(b), 17 and 20(d) of the Clearing Agreements; and (ii) to SAI, the full and complete payment and performance of the obligations of SSLLC under the Asset Purchase Agreement (all of such agreements collectively referred to herein as the "<u>Transaction Documents</u>"), however and whenever incurred or evidenced, whether primary, secondary, direct, indirect, absolute, contingent, due or to become due, now existing or hereafter contracted or acquired, and all modifications, extensions and renewals of each of them as described below in this Guaranty, and specifically excluding, for purposes of clarification, any trading losses incurred by the Introducing Brokers under the Clearing Agreements (collectively called the "<u>Guaranteed Obligations</u>"), upon the following terms and conditions . . .

*Id.* at A2–3.

[11] Section 5 of the PMA Side Agreement, in pertinent part, provides:

> **Other Portfolio Margining Services**. During the term of this Agreement and except as otherwise set forth on **<u>Schedule B</u>**, (a) Customer will not sign a portfolio margining agreement with another clearing broker or dealer, or otherwise permit another broker or dealer to provide portfolio margining services to Customer, with respect to a Core Business, and (b) will provide Penson with not less than 75 days' written notice prior to signing an agreement with another broker or dealer, or otherwise permitting another broker or dealer to provide the services provided hereunder or under the Account Documents (the **"Services"**), with respect to a Non-Core Business (it being understood that Customer shall not have the right to enter into a Non-Core Business that is reasonably likely to materially and adversely affect Customer's credit without Penson's prior written consent).

SAI paid the purchase price in Penson Worldwide Inc. ("PWI") common stock with initial consideration of 1,085,294 shares of PWI stock and four subsequent "earnout" payments to be made based on performance of the introducing brokers over the next four years.[12]

## B.    Termination of the Opus/PFSI Relationship

On January 26, 2012, Opus sent PFSI a letter notifying PFSI that it would be terminating the PMA Side Agreement, effective January 31, 2012.  In the letter, Opus asserts that certain restrictions placed upon PFSI by the Financial Industry Regulatory Authority made it impossible or impracticable for PFSI to continue to provide services.[13] On January 30, 2012, PFSI responded, rejecting Opus' unilateral termination of the PMA Side Agreement and asserting that Opus' termination was a breach of the agreement.[14]

## C.    Penson's Bankruptcy

On January 11, 2013, SAI, PFSI and three affiliated entities ("Debtors") filed voluntary bankruptcy petitions in this court.  Debtors' cases were jointly administered.  On July 31, 2013, the Court entered an order confirming the Fifth Amended Joint Liquidation Plan of Penson Worldwide, Inc. and its Affiliated Debtors (the "Plan").[15]  The Plan became effective on August 15, 2013 (the "Effective Date").[16]  Pursuant to the Plan, on or before the Effective Date, Plaintiff was formed as a Delaware limited liability company and all of

---

Fishman Decl. Ex. E (PMA Side Agreement) § 5 (A142).

[12] Fishman Decl. Ex. B (APA) § 3.01 (A24).

[13] Fishman Decl. Ex. F (Letter dated January 26, 2012 from Andrew M. Fishman, President, Schonfeld Group Holdings, LLC as Manager of Opus Trading Fund, LLC to Bill Yancey, President Penson Financial Services, Inc.).

[14] Fishman Decl. Ex. G (Letter dated January 30, 2012 from Phil Pendergraft to Andrew Fishman, Mark Peckman, Robert Winn and Mark Peters).

[15] Fishman Decl. Ex. K (Findings of Fact, Conclusions of Law, and Order Confirming Fifth Amended Joint Liquidation Plan of Penson Worldwide Inc. and its Affiliated Debtors).

[16] *Id.*

Debtors' assets were conveyed or transferred to Plaintiff, including claims and causes of action.[17] Plaintiff was authorized to prosecute all causes of action for the benefit of four classes of membership interests. The bankruptcy estates were not substantively consolidated.

Defendant timely filed a proof of claim in the SAI bankruptcy case asserting a general unsecured claim in the amount of $3,783,932 asserting an unpaid earnout payment owed under the APA in connection with the sale of the Business.[18]

## D.    The FINRA Arbitration

On January 27, 2014, Plaintiff, on behalf of PFSI, filed a Statement of Claim with the Financial Industry Regulatory Authority against Opus, commencing a binding arbitration proceeding (the "FINRA Arbitration").[19] Plaintiff asserted two separate claims for two separate harms. The First Cause of Action sought approximately $1.8 million in compensatory damages for nonpayment of trades PFSI executed on behalf of Opus under the PMA Side Agreement prior to its termination (the "Failure to Pay Claim"). The Second Cause of Action sought damages in excess of $20 million for lost revenue for the remaining term of the PMA Side Agreement (the "Early Termination Claim"). The basis of the Second Cause of Action was Opus' alleged breach of the Contract Exclusivity Provision found in section 5 of the PMA Side Agreement.[20]

---

[17] *Id.*
[18] Fishman Decl. Ex. J (Proof of Claim).
[19] Fishman Decl. Ex. L (Statement of Claim).
[20] Fishman Decl. Ex. L (Statement of Claim) ¶ 49 (A294).

Opus filed its Answer and Affirmative Defenses in the FINRA Arbitration generally denying all allegations in the Statement of Claim and asserting twenty-three affirmative defenses.[21]

A panel of three arbitrators was appointed. The arbitrators accepted pre-hearing and post-hearing submissions and heard testimony and argument over six days.[22] On February 26, 2016, the FINRA arbitration panel entered an award (the "Arbitration Award"), in favor of Plaintiff/PFSI.[23] The relevant part of the Arbitration Award reads as follows:

### CASE SUMMARY

Claimant [Plaintiff/PFSI] asserted the following causes of action: breach of contract for failure to pay, and breach of contract exclusivity.

Unless specifically admitted in its Answer, Respondent [Opus] denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

### RELIEF REQUESTED

In the Statement of Claim, Claimant requested compensatory damages for breach of contract for failure to pay in the amount of $1,800,000.00, plus accrued interest, and compensatory damages for breach of contract of exclusivity in the amount of $20,000,000.00, plus accrued interest.

In the Statement of Answer, Respondent requested dismissal of the Statement of Claim with prejudice, attorneys' fees, costs, and such other relief as the Panel deems just and equitable.

At the close of the hearing, Claimant requested compensatory damages for breach of contract for failure to pay in the amount of $2,458,802.67, and compensatory damages for breach of contract of exclusivity in the amount of $21,264,169.00.

---

[21] Fishman Decl. Ex. M (Answer and Affirmative Defenses).
[22] *See* Fishman Decl. Exs. N (Penson Prehr'g Mem.), O (Opus Prehr'g Mem.), P (FINRA Arb. Tr. Day 1), Q (FINRA Arb. Tr. Day 2), R (FINRA Arb. Tr. Day 3), S (FINRA Arb. Tr. Day 4), T (FINRA Arb. Tr. Day 5), U (Penson Post-Trial Mem.), V (Opus Post-Trial Mem.).
[23] Fishman Decl. Ex. W (Arbitration Award).

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

At the conclusion of Claimant's Case in Chief Respondent requested dismissal of the Statement of Claim. After due deliberation the Panel denied the Motion on the grounds that the Claimant had established a prima facie case.

\*       \*       \*

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant compensatory damages in the sum of $1,018,300.06 plus accrued interest of $101,830.00 calculated at the rate of 2.5% from January 31, 2012 to January 31, 2016.

2. Any and all relief not specifically addressed herein, including attorneys' fees is denied.[24]

The Arbitration Award was subsequently confirmed as a judgment of the Supreme Court of

the State of New York, County of New York,[25] and paid in full.[26]

### E.    *The Adversary Proceeding*

On November 16, 2016, Plaintiff commenced the above-captioned adversary

proceeding by filing its Complaint and Objection to Claim ("Complaint").[27] Plaintiff labels

itself: "Penson Technologies LLC (successor in interest to SAI Holdings, Inc. and Penson

Financial Services, Inc.)." In the Complaint, Penson asserts five causes of action:

---

[24] Fishman Decl. Ex. W (Arbitration Award).
[25] Fishman Decl. Ex. Y (Judgment, Opus Trading Fund LLC v. Penson Technologies LLC, Index No. 650738/2017).
[26] Fishman Decl. Ex. Z (New York Judgment Docket and Lien Record).
[27] Fishman Decl. Ex. X (Complaint, Nov. 16, 2016).

| Count | Allegation | Plaintiff's status |
|---|---|---|
| Count I<br>Breach of Contract | Defendant breached the terms of the APA by causing Opus to breach the Contract Exclusivity Provision of the PMA Side Agreement and unjustifiably terminate the agreement. | successor in interest to SAI |
| Count II<br>Breach of Guaranty | Defendant "absolutely, unconditionally and irrevocably guaranteed its subsidiaries' performance under various agreements, including Opus' performance under the PMA Side Agreement."<br>Opus breached the PMA Side Agreement by terminating it without cause and Defendant has failed to answer for Opus' obligations as Defendant is required to under the Guaranty Agreement. | successor in interest to both PFSI and SAI to recover damages for the estates of both PFSI and SAI |
| Count III<br>Breach of Obligation of Good Faith and Fair Dealing | Defendant breached an implied covenant of good faith and fair dealing under the APA that required Defendant to ensure Opus discharged all obligations under the PMA Side Agreement and ensure Opus did not breach the PMA Side Agreement. | successor in interest to SAI |
| Count IV<br>Objection to Schonfeld Claim | Plaintiff disputes any earnout payment is owed under the APA, but to the extent any payment is owed, SAI's obligation to make the payment is excused by Defendant's material breach of the APA and thus Defendant's proof of claim should be disallowed.<br>Any earnout payment must be offset by SAI's damage claim due to Defendant's material breaches of the APA. | successor in interest to SAI |
| Count V<br>Declaratory Judgment | Plaintiff seeks a declaratory judgment that to the extent an earnout payment is owed by SAI to Defendant, Plaintiff is entitled to offset damages SAI suffered as a result of Defendant's breaches of the APA. | successor in interest to SAI |

On January 17, 2017, Defendant moved to dismiss the Complaint for lack of subject matter jurisdiction or, alternatively, requested that I abstain from hearing the lawsuit and/or dismiss it under the doctrine of *forum non conveniens*.[28] On May 21, 2018, I denied that motion,[29] holding that each count of the Complaint was statutorily core such that subject

---

[28] Def.'s Mot. to Dismiss, D.I. 9.
[29] *See Penson Technologies LLC v. Schonfeld Group Holdings LLC (In re Penson Worldwide)*, 587 B.R. 6 (Bankr. D. Del. 2018) ("Jurisdiction Opinion").

matter jurisdiction exists.[30] I also declined to enforce a forum selection clause, abstain from hearing the case or dismiss it.

Defendant filed its Answer on June 4, 2018.[31] On July 31, 2018, Defendant filed the Motion, the Opening Brief and the Fishman Declaration. On October 12, 2018, Plaintiff filed the Answering Brief.[32] Defendant filed the Reply Brief on November 14, 2018.[33] I heard argument on October 6, 2020 and took the matter under advisement.

*Jurisdiction*

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. 1334(b), the Amended Standing Order of Reference from the District Court in the District of Delaware and Article XVI of the Plan. Venue in this District is proper.

In the Complaint, Plaintiff consents to the entry of final orders or judgment.[34] In its Answer, Defendant affirmatively states that it does not consent to the entry of a final order.[35] Notwithstanding Defendant's lack of consent, I can enter a final order on this summary judgment motion.

In the Jurisdiction Opinion, I explored whether I could enter a final judgment in this adversary proceeding as part of my analysis of the forum selection clause. In that opinion, I determined that Plaintiff's affirmative claims in Counts I, II and III would necessarily be resolved in the context of ruling on Defendant's proof of claim. Plaintiff's objections to Defendant's proof of claim (Counts IV and V) are that Defendant's material breach of the

---

[30] *Id.* at 12–13 (holding that Counts I, II and III fall under § 157(b)(2)(C) as counterclaims by the estate against persons filing claims against the estate; Counts IV and V fall under § 157(b)(2)(B), allowance or disallowance of claims against the estate).

[31] Answer and Separate Defenses of Schonfeld Group Holdings LLC, D.I. 44 ("Answer").

[32] Plaintiff also filed the Declaration of Philip Pendergraft, D.I. 56 ("Pendergraft Decl.").

[33] Def.'s Reply, D.I. 58 ("Reply Brief").

[34] Compl. ¶ 6.

[35] Answer ¶ 6

APA and Guaranty Agreement in causing Opus to breach the Contract Exclusivity

Provision excuse SAI's obligation to pay the earnout payment and thus is a defense to the

proof of claim, or at least, setoff of any mutual obligations should be permitted. Thus,

under *Stern*,[36] I may enter a final order consistent with the United States Constitution.[37]

### *Summary Judgment Standard*

A court must grant a motion for summary judgment "if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."[38] To do so, a movant may rely on material in the record, including

depositions, documents, electronically stored information, affidavits or declarations,

stipulations, admissions and interrogatory answers.[39]

The court does not weigh evidence and determine the truth of the matter at the

summary judgment stage. Rather, the court determines whether there is a genuine dispute

of material fact.[40] A material fact is one which could alter the outcome of the case.[41] Here,

the outcome is driven by the language of the contracts and the legal effect of the Arbitration

---

[36] *Stern v. Marshall*, 564 U.S. 462 (2011).

[37] In the Jurisdiction Opinion, I observed that: "In *Stern*, the Supreme Court had the benefit of hindsight in determining what was and was not necessarily resolved in the claims resolution process. It is harder to make the determination at the outset of litigation…If during this litigation I conclude that I do not have to determine damages as part of the claims resolution process, I will enter proposed findings of fact and conclusions of law on that aspect of the adversary proceeding." 587 B.R. at 21 n.70. Given my ruling, I am not determining a quantum of damages owed under the APA. Accordingly, there is no reason to re-visit my decision. I also note that at argument on this motion, I asked counsel if either had any comment on my ability to enter a final judgment and neither did.

[38] Fed. R. Civ. P. 56(a) (applicable to adversary proceedings by Fed. R. Bankr. P. 7056).

[39] Fed. R. Civ. P. 56(c).

[40] *Argus Mgmt. Group v. GAB Robins, Inc.* (*In re CVEO Corp.*), 327 B.R. 210, 214 (Bankr.D.Del.2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[41] *Anderson*, 477 U.S. at 248.

Award.  Accordingly, any disputed facts that Penson purports to raise through the

Pendergraft Declaration are not material.

*Discussion*

### I.    Summary Judgment is Appropriate as to Count I.

Defendant moves for summary judgment on Count I making a very simple

argument.  In Count I, Plaintiff asserts breach of the APA—specifically, that Defendant

breached the APA by causing Opus to breach the Contract Exclusivity Provision of and

terminate the PMA Side Agreement.  Defendant contends it did not breach any provision of

the APA, and, more importantly for purposes of summary judgment, Plaintiff does not

specify what provision of the APA has been breached.

Plaintiff concedes that Defendant has not breached any express provision of the

APA.[42]  Instead, Plaintiff makes two arguments why Count I survives.  First, Plaintiff argues

that Defendant has breached the APA by breaching the implied covenant of good faith and

fair dealing imbedded in every contract governed by New York law.[43]  Second, Plaintiff

argues that the Guaranty Agreement and the APA constitute one, integrated contract such

that a breach of the Guaranty Agreement is a breach of the APA.

The first argument is easily addressed.  In Count III, Plaintiff pleads a claim for

breach of the implied covenant of good faith and fair dealing.  Under New York law, the

implied covenant of good faith and fair dealing is not a cause of action separate from breach

of contract; rather, it is duplicative of a breach of contract claim where it is based on the

---

[42] Answering Brief 26.

[43] Plaintiff's claims are governed by New York law, pursuant to the undisputed choice of law provision in the APA.  *See* Fishman Decl. Exs. B (APA) § 11.04 (A63), A (Guaranty Agreement) § 8 (A5), E (PMA Side Agreement) § 11 (A145).

same underlying predicate facts.[44]  Plaintiff's argument that the covenant of good faith and

fair dealing supports the viability of Count I is therefore misguided as being duplicative.  I

will address the covenant of good faith and fair dealing in connection with Count III, which

is based on separate predicate facts.

Plaintiff's second argument takes more analysis.  Relying on New York case law,

section 11.06 of the APA[45] and section 14 of the Guaranty Agreement,[46] Plaintiff argues that

the APA and the Guaranty Agreement constitute one agreement and should be read

together as an integrated document.  Plaintiff contends that when read together, the

Guaranty Agreement "applies to the entire transaction."[47]  Defendant does not contest that

the APA, the Guaranty Agreement and the other documents executed contemporaneously

---

[44] *Dorset Industries, Inc. v. Unified Grocers, Inc.*, 893 F.Supp.2d 395, 405 (E.D.N.Y. 2012).

[45] Section 11.06 of the APA provides:

> Section 11.06.    Entire Agreement: Amendment: No Waiver.  (a) This Agreement, together
> with the Ancillary Agreements and the Confidentiality Agreement, sets forth the entire
> understanding and agreement between the two parties with respect to the subject matter
> hereof and thereof and supersede and replace any prior understanding, agreement or
> statement of intent, in each case written or oral, of any kind and every nature with respect
> thereto. Any provision of this Agreement, the Ancillary Agreements or the Confidentiality
> Agreement may be amended, modified or waived in whole or in part at any time by an
> agreement in writing among the parties thereto.

Fishman Decl. Ex. B (APA) § 11.06 (A64).

[46] Section 14 of the Guaranty Agreement provides:

> 14.    Entire Agreement.  This Guaranty, the Services Agreement, the Execution
> Agreement, the Clearing Agreements, the Asset Purchase Agreement and the agreements.,
> annexes and schedules referenced therein or attached thereto embody the entire agreement
> between the Companies and Guarantor with respect to the guaranty by Guarantor of the
> Guaranteed Obligations.  This Guaranty supersedes all prior agreements and
> understandings, if any, with respect to the guaranty by Guarantor of the Guaranteed
> Obligations.  No condition or conditions precedent to the effectiveness of this Guaranty
> exist. This Guaranty shall be effective upon execution by Guarantor and delivery to the
> Companies.

Fishman Decl. Ex. A (Guaranty Agreement) § 14 (A6).

[47] Answering Brief 33.  Plaintiff puts a slightly different, and less controversial spin on the
integration clause when it argues that "as a result, the guaranty provisions applies to the APA, such
that [Defendant's] failure to pay for damages resulting from Opus' breach under the PMA Side
Agreement constitutes a breach of the Guaranty and a breach of the APA." Answering Brief 35.

with them embody the entire agreement between the parties.[48]  But, Defendant argues that

reading the two agreements together cannot change the terms of those agreements, give

Plaintiff additional rights under the APA, or expand any guaranty to apply to the "entire

transaction."

Under New York law, documents memorializing component parts of one transaction

may properly be read together.[49]  If when read together the documents are ambiguous as to

a material fact, summary judgment cannot be granted.[50]  Here, reading the APA and

Guaranty Agreement together does not create any ambiguity.

Two provisions are arguably at issue.[51]  First, section 6.2 of the APA provides

that Defendant guarantees certain performance by and obligations of **SSLLC**.

Specifically, section 6.2 provides that Defendant agrees to guarantee the complete and

timely performance of **SSLLC's** obligations under the APA and the Ancillary

Agreements pursuant to the terms of a guaranty.  Defendant also agrees to cause

**SSLLC** to comply with the provisions of the APA and refrain from taking actions that

would impair **SSLLC's** ability to perform its obligations under the APA or the

Ancillary Agreements.

Second, section 1 of the Guaranty Agreement provides that Defendant

guarantees certain performance by and/or obligations of both SSLLC and Opus.  As set

---

[48] Reply Brief 8.

[49] *Commander Oil v. Advance Food Service Equipment*, 991 F.2d 49, 52–53 (2d Cir. 1993).

[50] *Id.* at 53–54 (reading asset purchase agreement and lease together and ruling that material fact existed with respect to claim for environmental liability when asset purchase agreement specifically excluded claims for environmental liability but also contained a "catch-all" litigation category, and lease contained an indemnification provision specifically covering liabilities by reason of any environmental law).

[51] I say arguably, because Plaintiff did not specifically point to section 6.2 of the APA perhaps recognizing that to the extent this section provides a guarantee separate from the Guaranty Agreement, it only pertains to Seller's obligations, not Opus' obligations.

forth above, in the Guaranty Agreement, Defendant guarantees the "Guaranteed

Obligations." Those Guaranteed Obligations are delineated as follows:

> (i)    to PFSI the full and complete performance by the Introducing Brokers (as set
> forth in sections 1(e), 11(b), 17 and 20(d) of the Clearing Agreements), and
>
> (ii)   **to SAI**, the full and complete payment and performance **of the obligations of
> Seller** under the APA.[52]

There is no inconsistency with respect to Defendant's guarantee obligations under the

APA and the Guaranty Agreement. As to SAI (on whose behalf Plaintiff brings this

Count I), under both agreements Defendant guarantees the performance of

SSLLC/Seller. But, SAI is not the beneficiary of any guaranty of Opus' performance

under either agreement.

Further, nowhere in any agreement does Defendant provide a guarantee of the

"entire transaction." The sophisticated parties to this contract specifically defined

Defendant's guarantee obligations and designated the entity to whom those obligations run.

Such a contractual provision belies any general notion of a guarantee of the "entire

transaction."[53]

Reading the APA and Guaranty Agreement as one agreement, the contract language

is not ambiguous nor did Defendant provide a guarantee of the "entire transaction."

Summary Judgment is granted as to Count I.

## II.    Summary Judgment is Appropriate as to Count II.

Count II is Plaintiff's claim that Defendant breached the Guaranty Agreement.

Trustee brings this claim as successor in interest to both PFSI and SAI. The underlying

---

[52] Fishman Decl. Ex. A (Guaranty Agreement) A3 (emphasis added).
[53] Moreover, as set forth below, Defendant did guarantee Opus' performance under the Contract Exclusivity Provision, but to PFSI, not to SAI. Once again, any notion of a generalized guarantee of the "entire transaction" must yield to the actual terms of the contract.

predicate of Defendant's obligation is Opus' breach of the PMA Side Agreement, and

specifically, Opus' breach of the Contract Exclusivity Provision.  Count II fails as to SAI

because Defendant's guarantee of Opus' performance does not run to SAI.  Count II fails as

to PSFI (and, as to SAI) because Opus' breach of the PMA Side Agreement was completely

and finally determined in the FINRA Arbitration, and damages for that breach have been

paid.

### A. *Defendant's Guarantee of Opus' Performance Runs to PFSI, not SAI.*

As set forth above, the Guaranty Agreement, by use of a clearly defined term,

specifies both the subject matter of Defendant's guarantee obligation and the entity to

which the guarantee runs.  Under the Guaranty Agreement, Defendant guarantees certain

performance obligations to either PFSI or SAI as follows:

(i)    **to PFSI** the full and complete performance **by the Introducing Brokers** (as set forth in sections 1(e), **11(b)**, 17 and 20(d) of the Clearing Agreements), and

(ii)    **to SAI**, the full and complete payment and performance **of the obligations of Seller** under the APA.

As in the APA, Defendant guarantees **SSLLC's** obligations under the APA.  This

guarantee runs in favor of **SAI**.  Defendant also guarantees the full and complete

performance by the Introducing Brokers—which includes **Opus**—under specified sections

of the Clearing Agreements.  This guarantee runs in favor of **PFSI**; it does not run to **SAI**.

Plaintiff did not sue Defendant in Count II (or in any other count of the

Complaint) based on any breach committed by **SSLLC**.  And, as SAI is not the

beneficiary of Defendant's guarantee of Opus' performance, it has no claim for breach of the

Guaranty Agreement.

### B. *Any Guarantee of Defendant's Obligation to Penson has been Satisfied*

Defendant did guarantee Opus' performance of the Contract Exclusivity Provision to PFSI. So, on the surface, it would appear that Count II should survive the motion for summary judgment. But, the underlying predicate of Count II is that Opus breached the PMA Side Agreement by terminating it without cause. This issue—Opus' breach of the Contract Exclusivity Provision—was a subject of the FINRA Arbitration. Plaintiff received an award in the FINRA Arbitration and the award was paid. Plaintiff does not get the proverbial second bite at the apple.

Collateral estoppel, or issue preclusion, bars the relitigation of an issue determined in a prior proceeding where (i) the issue was resolved by a prior final judgment, (ii) the issue was actually litigated and necessarily decided in reaching the judgment, (iii) the issue in the prior proceeding is decisive in the subsequent action, and (iv) the party to be estopped had a full and fair opportunity to contest the issue.[54] Collateral estoppel applies to issues resolved by arbitration where there has been a final determination on the merits.[55]

The moving party has the burden of showing that the issue to be precluded is identical to the issue in the prior proceeding, that the issue was necessarily decided in the first proceeding and that the issue is decisive of an issue in the later proceeding. Under the collateral estoppel doctrine, there must be "an identity between the particular matter in the

---

[54] *Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 17 (2015). Federal courts look to state law to determine the preclusive effect of a state court judgment concerning state court claims. *See In re Raytrans Holding, Inc.*, 573 B.R. 121, 129 (Bankr. D. Del. 2017). New York law governs these claims. *See supra* note 43.

[55] *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267–68 (2d Cir. 1997) (citing *Hilowitz v. Hilowitz*, 444 N.Y.S.2d 948, 949 (N.Y. App. Div. 1981))

second action and that presented in the first… [a]nd it must be shown that this *identical issue* was necessarily decided in the first proceeding and is conclusive in the subsequent action."[56]

Under New York law, collateral estoppel can be asserted by a litigant who was not a party to the original action.[57] "When issue preclusion is asserted the core question is whether the party against whom issue preclusion is sought to be invoked has had 'a full and fair opportunity to contest' the issue in prior litigation, irrespective of the identity of the adversary."[58] In determining whether a party has had a full and fair opportunity to litigate, the court can consider various factors, including the importance of the issue to the first proceeding, the extent to which the issue was litigated in the first action, if the first proceeding was in a different forum or subject to different procedural rules, whether the party to be estopped has the same incentive to litigate the first proceeding, whether the party to be estopped was adequately represented in the first action, whether the applicable law is the same in both actions, whether further litigation was foreseeable in the first action, whether there have been inconsistent verdicts on the same issue, whether there is new evidence available and whether there is evidence of a compromise verdict in the first action.[59]

Defendant asserts that the FINRA Arbitration fully resolved two issues: whether Opus breached the PMA Side Agreement by terminating it and the extent of Opus' liability under that agreement.  Plaintiff responds that there were two causes of action asserted in the

---

[56] *D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 666 (1990) (citing Restatement (Second) of Judgments § 27 cmt. c (1982)) (emphasis added).
[57] *GTF Mktg., Inc. v. Colonial Aluminum Sales, Inc.*, 108 A.D.2d 86, 89 (N.Y. App. Div. 1985) ("It is now axiomatic in New York that mutuality is 'a dead letter'").
[58] *Id.*
[59] *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292 (1981).

FINRA arbitration (the breach for failure to pay and the breach for early termination) and that the basis for the Arbitration Award is not clear, making it impossible to determine if either or both of the claims were decided. Additionally, Plaintiff observes that there were no claims against Defendant litigated at all, nor were there any claims brought for breach of the APA.

I agree with Defendants; all of the requisites for collateral estoppel are present. First, the issue of whether PFSI breached the Contract Exclusivity Provision was raised and litigated in the FINRA Arbitration. This is evidenced by not only the Statement of Claim, but by the Arbitration Award itself. The Arbitration Award specifically states that (i) Trustee requested in its Statement of Claim $20 million in compensatory damages for breach of the Contract Exclusivity Provision, (ii) at the close of the hearing, Trustee increased the requested compensatory damages to $21,264,169 on account of Opus' breach of the Contract Exclusivity Provision and (iii) the panel denied Opus' motion to dismiss the Statement of Claim finding that Trustee had established a prima facie case on his claims. And, after considering all the evidence and arguments, the Panel awarded Trustee $1,018,300.06 plus interest in compensatory damages and denied "any and all" other relief. Second, the Arbitration Award is final. It was rendered by the arbitrators and affirmed by the New York Supreme Court. Third, Trustee is both the Claimant in the FINRA Arbitration and the Plaintiff here. Trustee was acting as successor to PFSI in the FINRA Arbitration and is acting as successor to PFSI here with respect to Court II. Trustee clearly had the same incentive to litigate the breach of the Contract Exclusivity Provision in the FINRA Arbitration as he does here.

I am not persuaded by Plaintiff's argument that because the Arbitration Award does not specifically break down the award between Trustee's first and second causes of action it is impossible to determine if either or both claims were decided.[60] The Arbitration Award is clear: it refers to claims (plural), it awards Trustee compensatory damages of a specified amount and it denies "any and all" other relief. It is not necessary to know what portion of the amount awarded, if any, is attributed to Opus' breach of the Contract Exclusivity Provision claim because the Panel found a breach of the PMA Side Agreement and established Opus' overall liability for breach.[61]

Cases cited by Trustee do not compel a different result. In *Klein Maus*, Ronald and Jenny Yakin brought claims against their securities broker, its president and their trader before a NASD arbitration panel.[62] In the NASD arbitration, claimants sought compensatory damages of approximately $700,000 for unauthorized trades in securities over a period of three months. The claimants alleged multiple theories of liability: unauthorized purchases, failure to execute sell orders, breach of the account agreement, violations of state law and NASD Conduct Rules, fraud, unsuitability, breach of fiduciary duty, conversion, violations of the Securities Exchange Act of 1934 and control person liability.

---

[60] Plaintiff argues that the FINRA Panel may not have decided the Early Termination Claim because Opus argued in the FINRA Arbitration that the APA was a separate contract, PFSI lacked standing to pursue the claims set forth in the Statement of Claims, and that the damages calculation presented by Plaintiff in the arbitration was based on the APA to which Opus is not a party. *See* Answering Brief 7–8. Assuming these arguments were all made (which Defendant disputes), if the Panel found any of these arguments persuasive, then Plaintiff failed to prove an element of its case. Nonetheless, the Early Termination Claim was still adjudicated and decided and the Award is still final.

[61] I note that the Arbitration Award contains all mandatory components. *See* FINRA, Rule 13904(e) (2018). An award may contain a rationale, but that is not required. FINRA, Rule 13904(f) (2018). Further, if parties jointly request, the Panel will issue an "explained decision." FINRA, Rule 13904(g) (2018). Apparently, no such request was made.

[62] *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 414 (Bankr. S.D.N.Y. 2003) ("*Klein Maus*").

Notwithstanding the multiple theories, each cause of action sought identical damages based on the same conduct. All defendants defaulted and an arbitration award was entered in favor of claimants for approximately $250,000. One defendant was dismissed with prejudice. The award did not specify which of the many theories of liability formed the basis of the award.

Thereafter, the Securities Investor Protection Corporation filed a complaint and application in the United States Bankruptcy Court for the Southern District of New York, which placed Klein Maus into a SIPA liquidation. Irving H. Picard was appointed trustee. The Yakins filed claims in the SIPA proceedings and Picard objected on multiple grounds, including that the Yakins' claims were not entitled to "customer protection" under SIPA, but rather were only general unsecured claims. In response to Picard's objection, the Yakins argued that the arbitration award collaterally estopped Picard from relitigating the issue of unauthorized trading, such that their claims were "customer claims" under SIPA entitled to "customer protection" by operation of law. The bankruptcy court disagreed. First and foremost, the court ruled that because the arbitration award was based on a default judgment, the underlying claim was not actually litigated. But, continuing the analysis, *in dicta*, the court ruled that because the arbitration award did not identify which of the multiple theories formed the basis of the $250,000 award, it was unclear whether the arbitrators awarded damages based on unauthorized trading. If the award was based on another theory (e.g. conversion), the Yakins' claim would not be eligible for customer protection. Because of this uncertainty, collateral estoppel was not a viable defense to Picard's objection.

Similarly, in *In re Hartmann*, the basis for the award was critical to the subsequent litigation.[63]  There, a stockbroker filed an individual bankruptcy case and a former client filed a complaint to determine her debt nondischargeable.  Debtor and the former client previously participated in a FINRA arbitration proceeding in which the former client raised eight separate bases for an award based on the broker's conduct, including breach of fiduciary duty, fraud and misrepresentations, negligence and violations of federal and state securities laws.  The former client received an award of damages, which stated in relevant part: "1.  Regarding [former client's] claims of breach of fiduciary duty, Respondents [including broker] are jointly and severally liable to and shall pay [former client] $195,132.00 . . . 4.  All other claims by [former client] are denied."[64]

The bankruptcy court ruled in the non-dischargeability action that the arbitration award did not have preclusive effect to bar the former client's claim of non-dischargeability because it was possible the arbitrators rendered the award based only on the breach of the fiduciary duty claim, and did not need to reach a finding on any other basis.  Under those circumstances, the court did not know whether the arbitrators determined that the broker's conduct was not fraudulent (i.e. "all other claims denied") or simply did not reach the fraud claims because there was no need as the arbitrators needed only one basis for the award.

Unlike in *Klein Maus* and *Hartmann*, here, the basis of the award is irrelevant to Count II of the Complaint.  Trustee brought two separate causes of action in the FINRA Arbitration.  The causes of action were not alternative theories of liability for the same conduct as in *Klein Maus* and *Hartmann*.  Rather, the causes of action litigated in the FINRA

---

[63] *See* 2011 WL 2118870, at *2–3 (Bankr. D. Colo. May 25, 2011).
[64] *In re Hartmann*, 2011 WL 2118870, at *2–3.

Arbitration were based on separate conduct and separate breaches of the PMA Side Agreement. The Panel ruled on both causes of action and awarded compensatory damages. Whether the damages were awarded solely with respect to the Failure to Pay Claim, solely with respect to the Early Termination Claim or with respect to both claims, both claims were adjudicated. Plaintiff's theory that the Panel somehow did not rule on the Early Termination Claim because of defenses raised by Opus has no basis in the text of the Arbitration Award.

Finally, at argument, Penson's counsel stated that Penson's best case on the collateral estoppel argument was *Crystal Clear Development*. In *Crystal Clear Development*, the owner of a piece of property ("Owner") retained an architectural firm to perform design, bid and construction administration services, including verifying that work performed on the project complied with the construction documents.[65] Owner hired a general contractor under a separate agreement to oversee the construction on the project. Dissatisfied with the general contractor's work, Owner terminated both the general contractor and the architectural firm.

In an arbitration proceeding between Owner and the general contractor, the general contractor's claim against Owner (presumably for work performed on the project) was denied and Owner was awarded $33,756 plus interest predicated on general contractor's failure to perform its obligations in accordance with their contract. After the arbitration, Owner sued the Architectural Firm in state court alleging breach of contract and professional malpractice. While helpful details of the Architectural Firm's collateral

---

[65] *Crystal Clear Development, LLC v. Devon Architects of New York, P.C.*, 2010 WL 2150627 (N.Y. Sup. Ct. May 10, 2010).

estoppel contention are not provided in the opinion, the Architectural Firm argued that Owner's claims against it were simply a repackaging of Owner's claims against the general contractor which had been decided in the arbitration proceeding.

The trial court ruled that Owner's arbitration award against the general contractor did not preclude Owner's claims against the architectural firm. This part of the decision was affirmed on appeal.[66] The appellate court observed that the contract between Owner and architectural firm were separate and distinct from the contract between Owner and the general contractor and that the architectural firm had different duties and obligations under its contract.

*Crystal Clear Development* is factually distinguishable. In Count II, Plaintiff is suing on the Guaranty Agreement. In the Guaranty Agreement, Defendant guaranteed Opus' obligations under the PMA Side Agreement. Defendant's obligations under the Guaranty Agreement are not separate and distinct from Opus' obligations. Under the Guaranty Agreement, Defendant has not undertaken any separate duties or additional duties to PFSI. It has merely guaranteed or backstopped Opus' obligations under the PMA Side Agreement. Opus' obligations—and the liability arising thereunder—were decided in the FINRA Arbitration. And the damages awarded were paid. As a guarantor, Defendant can have no greater or different liability than the obligation guaranteed.[67] Penson's attempt to relitigate that liability is precluded under principles of collateral estoppel.

Summary Judgment is granted as to Count II.

---

[66] *Crystal Clear Dev., LLC v. Devon Architects of New York, P.C.*, 949 N.Y.S.2d 398, 400 (N.Y. App. Div. 2012)

[67] *See PAF-PAR LLC v. Silberberg*, 118 A.D.3d 446, 446 (N.Y. App. Div. 2014), *aff'd*, 27 N.Y.3d 930 (N.Y. 2016) ("This [guaranty]cannot operate to make the guarantor liable for more than what the primary obligor was obligated to pay and did pay.").

### III.    Summary Judgment is Appropriate as to Count III.

In Count III, Penson, as the successor in interest to SAI, alleges that Defendant breached the implied covenant of good faith and fair dealing implicit in every contract. Specifically, Plaintiff alleges that: "Schonfeld had an implied obligation of good faith and fair dealing under the APA to ensure that its wholly owned subsidiary Opus discharge the obligations contained in the PMA Side Agreement and ensure that Opus did not breach the PMA Side Agreement. Schonfeld breached this obligation by causing Opus to breach the PMA Side Agreement without cause of justification, thereby depriving SAI of a major part of the benefits of the APA."[68]

Penson is correct that New York law recognizes a covenant of good faith and fair dealing in every contract.[69] This implied covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included."[70] But, as Defendant argues, the implied covenant may only be invoked consistent with the terms of the contract; it cannot be used to add a substantive term to the contract.[71]

Here, Defendant's obligation to guarantee Opus' performance under the PMA Side Agreement, and specifically the Contract Exclusivity Provision, is expressly set forth in the Guaranty Agreement. That performance, however, does not run to SAI. As Plaintiff argued, and I accepted,[72] the APA and the Guaranty Agreement must be read together. To

---

[68] Compl. ¶¶ 44, 45.
[69] *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995).
[70] *Id.*
[71] *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005) (applying New York law) ("The implied covenant 'can only impose an obligation 'consistent with other mutually agreed upon terms in the contract.' It does not 'add [ ] to the contract a substantive provision not included by the parties.'") (internal citations omitted).
[72] *See* discussion *supra* Part I.

25

read into the APA an implied covenant of good faith and fair dealing that would make Defendant's guarantee of Opus' performance run to SAI would be inconsistent with and directly contrary to the express terms of the negotiated contract.

Finally, in its Answering Brief, Plaintiff articulates a claim, untethered to its Complaint, that Schonfeld acted intentionally or willfully such that a claim based on the implied covenant of good faith and fair dealing falls within the carve-out to the exclusive remedy section of the APA.[73] This argument fares no better. As articulated in the Answering Brief, Plaintiff is arguing that Schonfeld's intentional or willful conduct harmed SAI. As I just concluded, to recognize an obligation of good faith and fair dealing in favor of SAI above and beyond its enumerated protections is inconsistent with the APA. Therefore, the exception in the exclusive remedies section is irrelevant.

Summary judgment will be granted on Count III.

---

[73] Section 10.09 of the APA provides, in relevant part:

Exclusive Remedy. After the Closing . . . the [listed remedies] shall be the sole and exclusive remedy for monetary damages for any breach of representations, warranties, covenants or agreements herein, provided, however, the foregoing shall not limit the right to seek recovery for fraud or willful misconduct or to seek specific performance, injunctive relief or other available equitable remedies.

Fishman Decl. Ex. B (APA) § 10.09 (A61).

IV.    **Summary Judgment is Appropriate as to Counts IV and V**

Counts IV and V are objections to Defendant's proof of claim.  The basis for the objections is that Defendant breached the APA.  Given that summary judgment is appropriate on Counts I, II and III, it is appropriate for summary judgment to be granted on Counts IV and V as well.[74]

*Conclusion*

For the reasons set forth above, the Motion will be granted as to each count. An order will be entered.

Dated: October 19, 2020

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

---

[74] Plaintiff does not address the request for summary judgment on Counts IV and V in its Answering Brief.